**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT NASHVILLE**

**JANUARY SESSION, 1998**

FILED

April 1, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9610-CC-00456** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **MONTGOMERY COUNTY** |
| **VS.** | ) | |
| | ) | **HON. ROBERT W. WEDEMEYER** |
| **MATTHEW C. WELKER,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Sentencing) |

**ON APPEAL FROM THE JUDGMENT OF THE
CIRCUIT COURT OF MONTGOMERY COUNTY**

FOR THE APPELLANT:

MICHAEL J. LOVE
215 South Second Street
Clarksville, TN 37040

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

LISA A. NAYLOR
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

JOHN CARNEY
District Attorney General

ARTHUR BIEBER
Assistant District Attorney General
204 Franklin Street, Suite 200
Clarksville, TN 37040

OPINION FILED _____

AFFIRMED AS MODIFIED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Matthew C. Welker, appeals as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. He was convicted by a Montgomery County jury of voluntary manslaughter.[1] The trial court sentenced him to six years imprisonment with the Department of Correction as a Range I, standard offender. The trial court also imposed a fine of five thousand dollars ($5000) and ordered the Defendant to pay restitution in the amount of nine thousand six hundred dollars ($9600). In this appeal, the Defendant argues that the trial court erred by failing to grant probation, that his sentence is excessive, and that the trial court erred in imposing restitution with a sentence of confinement. After reviewing the record, we conclude that only the Defendant's third issue has merit. Accordingly, we affirm the sentence of confinement but must reverse the order of restitution.

Although the Defendant does not contest the sufficiency of the evidence, a brief summary of the proof offered at trial is pertinent to our consideration of the sentencing issues raised in this appeal. In October of 1994, the Defendant was dating and at times living with Alanna Simmons. At that time, Simmons had two children from a previous relationship, Brianna and Brandon Paulen. Brianna was three years old and Brandon, the victim in this case, was approximately fifteen months old at the time of the offense. Alanna Simmons worked long hours during this time period. As a result, a woman by the name of Christine Johnson took

---

[1] Tenn. Code Ann. § 39-13-211.

care of Brianna and Brandon during the day and the Defendant took care of the children in the evening. The Defendant was twenty years old at this time.

On the evening of Thursday, October 20, 1994, Alanna Simmons took Brandon to the emergency room because the child appeared to be sick. He had been coughing and vomiting and had shown signs of decreased appetite and lethargy since the previous day. Dr. Stephen Kent examined the victim. He testified that the victim appeared to be slightly ill but his appearance was otherwise unremarkable. Dr. Kent diagnosed the victim as having bronchitis, gastritis and possibly a viral infection. The victim was discharged after Dr. Kent wrote a prescription.

On the following evening, Friday, October 21, 1994, the Defendant came to the home of Jennifer Blair, a sister of Alanna Simmons, carrying the victim. The victim was not breathing. Blair called 911 and Blair's husband began to perform cardiopulmonary resuscitation ("CPR") on the victim. The Defendant told Blair that the victim had choked on hamburger. Officer Allen Klein of the Clarksville Police Department responded to the emergency call. He performed CPR on the victim until emergency medical technicians arrived on the scene. According to Officer Klein, the Defendant approached him and told him that he had been babysitting and that the victim had flu symptoms. The Defendant did not mention the victim's choking on hamburger.

The victim was transported to the hospital. Attempts to resuscitate him failed. During those attempts, Dr. William Shippen noticed retinal hemorrhages in the victim. This condition led Dr. Shippen to suspect that the victim had similar

tissue damage in his brain, possibly resulting from a blow to the head or "shaken baby syndrome." An autopsy was later performed by Dr. Charles Harlan. Dr. Harlan testified that the cause of death was blunt trauma to the head and abdomen. The blunt trauma to the head resulted in subdural hematomas on both sides of the brain, with forty cubic centimeters (approximately eight teaspoons) of blood pooled on each side. The blunt trauma to the abdomen ruptured the victim's right adrenal gland and produced hemorrhaging, resulting in approximately one hundred seventy-five cubic centimeters of free blood in the abdomen. The amount of blood lost to these injuries equates with approximately one third of the victim's blood volume, meaning that the victim had only two thirds of the ordinary volume of blood in circulation. This deficiency in blood volume produced a corresponding deficiency in the provision of nutrients and oxygen to the victim's body and brain. The cardiac arrest suffered by the victim on October 21, 1994, was secondary to the blood loss. According to Dr. Harlan, the blows producing these injuries occurred between one and five days prior to the victim's death. Dr. Harlan noted that there were multiple injuries indicated and that the injuries were consistent with blows from a fist or a foot.

In the early morning hours of Saturday, October 22, 1994, shortly after the death of the victim, police officers interviewed the Defendant. Detective Phillip Ward testified that the Defendant stated that the victim's injuries could have been caused by a fall he suffered while playing with his sister Brianna approximately a week and a half earlier. With regard to his personal circumstances, the Defendant related that he was diabetic. His diabetes was particularly acute and he had trouble maintaining a proper blood sugar level. The Defendant was also disabled due to a back injury, and had mental problems stemming from abuse he

-4-

had suffered as a child. The lingering effects of this abuse included episodes where the Defendant would go into a "fit" and strike out at whatever was around him. The Defendant stated that he often does not remember what occurs during these "fits." In response to questions about whether he could have struck the victim during one of these "fits," the Defendant stated that "it was possible, but not probable because he would have been exhausted after it happened."

Law enforcement officials conducted a second interview with the Defendant on Monday, October 24, 1994. Detective Anthony Clark of the Clarksville Police Department and Agent Jeff Puckett of the Tennessee Bureau of Investigation recounted essentially the same facts. At the Monday interview, the Defendant first stated that he did not know what had happened to the victim. Police officers explained the cause of the victim's death as revealed by the autopsy. The Defendant then stated that the victim's sister, Brianna, had inflicted the injuries. The officers responded that they did not believe the injuries suffered by the victim were consistent with those that could have been inflicted by his three-year-old sister. The Defendant then stated that two days before the victim's death, he had tripped and landed on the victim's abdomen. He also stated that he had accidentally struck the victim in the head while playing. Upon further questioning, the Defendant admitted he had hit and kicked the victim to get him to leave a room which he was cleaning. Shortly thereafter, the Defendant was placed under arrest. At that point, he became belligerent and stated that he was lying about having hit and kicked the victim. The Defendant requested an attorney, and the interview ceased for that purpose. A short time later, however, the victim asked to speak with the officers again and told them that his account of hitting and kicking the victim while he cleaned the home was the truth.

The Defendant did not testify at trial. He did, however, offer the testimony of Dr. Barry Nurcombe, a psychiatric expert. At the Defendant's request, Dr. Nurcombe performed a mental evaluation shortly before trial to determine the Defendant's competency to stand trial and mental state at the time of the offense. Dr. Nurcombe testified that he had first met the Defendant in 1990. The Defendant was referred to Dr. Nurcombe by a juvenile court apparently because he had set fire to a neighbor's home. Dr. Nurcombe conducted several interviews and treatment periods with the Defendant in 1990 and 1991. During that time, the Defendant related that he had been physically and sexually abused between the ages of five and eleven by his mother's boyfriend, Jerry Knight. The abuse was quite extensive and was among the most severe cases Dr. Nurcombe had ever encountered. As a result of the abuse, the Defendant was diagnosed as suffering from a type of post-traumatic stress disorder known as intermittent explosive disorder. Dr. Nurcombe described intermittent explosive disorder as a disorder involving "intermittent explosions of rage precipitated by events which are not often proportioned to the rage. In other words, the rage is much more excessive than one would expect given the event which precipitates it." Dr. Nurcombe stated that individuals may or may not suffer from emotional disorder between the rage explosions. During the rage explosions, individuals may be self-injurious, may assault others, or may destroy property.

The Defendant's intermittent explosive disorder most frequently manifested itself in the form of episodes of rage outbursts with the Defendant striking out at everything around him. These episodes would sometimes be accompanied by the Defendant's hearing voices, particularly that of his childhood abuser, Jerry Knight. Often the Defendant would have little or no memory of the outbursts

-6-

immediately after the episodes. The disorder would also manifest itself in the form of self-injury, with the Defendant injuring himself by striking a wall or hitting his head against an object. The Defendant had also injected himself with an insulin overdose on more than one occasion.

The Defendant appeared to be making progress during the therapy sessions conducted in late 1990 and early 1991, with his episodes of rage becoming less frequent. In early 1991, however, the Defendant encountered Jerry Knight in a supermarket. Immediately after this encounter, the episodes of rage explosions recurred frequently.

Dr. Nurcombe interviewed the Defendant after the death of the victim. From that interview, Dr. Nurcombe concluded that the Defendant was still suffering from intermittent explosive disorder. The disorder was, however, less severe than it had been in 1990 and 1991, as evidenced by less frequent rage outbursts. Dr. Nurcombe also related a history of events leading up to the death of the victim, as told to him by the Defendant. Shortly before moving in with Alanna Simmons in the summer of 1994, the Defendant saw Jerry Knight at a gas station. This encounter upset the Defendant. At the same time the Defendant heard rumors that his mother was having an affair with a younger man. These rumors also upset the Defendant. Furthermore, the Defendant's relationship with Alanna Simmons was not altogether stable. Brianna Paulen was apparently disobedient and difficult to control and Alanna Simmons did little to discipline her. In contrast, Brandon Paulen created no difficulties and was easy to take care of according to the Defendant.

In September of 1994, the Defendant believed that Jerry Knight had moved into a trailer very near his and Alanna Simmons' residence. He believed that he saw Jerry Knight staring at him in a menacing way from that trailer. The Defendant found this circumstance extremely upsetting. The Defendant's sister later walked down to the trailer to confirm this circumstance. Once there, she encountered three men, one of whom did resemble Jerry Knight. The Defendant's sister, however, "was not able to say that it was Jerry Knight." She asked the men if Jerry was there. One man replied affirmatively while another man replied negatively. She left somewhat confused and returned to attempt to reassure the Defendant. The victim died the following month, October of 1994.

On December 5, 1994, the Defendant was indicted on one count of second degree murder. He was tried before a Montgomery County jury from April 23 to April 25, 1996. After considering the proof, the jury found the Defendant guilty of voluntary manslaughter. The Defendant now appeals to this Court, challenging only the sentence imposed by the trial court.

In his first issue on appeal, the Defendant argues that the trial court erred by failing to grant him probation. A sentencing hearing was conducted on May 24, 1996. Voluntary manslaughter is a Class C felony. Tenn. Code Ann. § 39-13-211(b). The range of punishment applicable to Range I, standard offenders found guilty of Class C felonies is three to six years. Tenn. Code Ann. § 40-35-112(a)(3). The trial court sentenced the Defendant to the maximum term of six years imprisonment with the Department of Correction as a Range I, standard offender. In denying the Defendant's request for probation, the trial court stated as follows:

> Now, the next question and obviously the most important to Mr. Welker is whether probation is an option. Obviously it is an option. I mean, whether or not the Court is going to impose that or not. In looking at that the Court has to consider the fact that most likely Mr. Welker's best interest would be served by probation with a mandate for continued psychiatric treatment. Society's best interest in the Court's opinion would be served by Mr. Welker serving his sentence with the Tennessee Department of Corrections. For the reason that that is just simply necessary to avoid depreciating the seriousness of the offense, and to provide an effective deterrence to others likely to commit similar offenses.
>
> I am not skilled at making sermons and making commentaries on the status that society is in today. But in this Court's humble opinion if the Judges do not put people in the penitentiary for intentionally or knowingly killing infants then I can't image [sic] that that would be do [sic] anything other than depreciate the seriousness of this offense. Failing to that [sic] would certainly provide no deterrence to others likely to commit this type of offense.

From this language, it appears that the trial court based the denial of probation on avoiding depreciating the seriousness of the offense and providing effective deterrence to others likely to commit similar offenses. See Tenn. Code Ann. § 40-35-103(1)(B).

Of course, a defendant who "is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Our sentencing law also provides that "convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation, shall be given first priority regarding sentences involving incarceration." Tenn. Code Ann. § 40-35-102(5). Thus, a defendant sentenced to eight years or less who is not an offender for whom incarceration is a priority is presumed eligible for alternative sentencing unless sufficient evidence rebuts the presumption. However, the act does not

provide that all offenders who meet the criteria are entitled to such relief; rather, it requires that sentencing issues be determined by the facts and circumstances presented in each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987).

Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103(3) - (4). The court should also consider the potential for rehabilitation or treatment of the defendant in determining the sentence alternative. Tenn. Code Ann. § 40-35-103(5).

When imposing a sentence of total confinement, our Criminal Sentencing Reform Act mandates the trial court to base its decision on the considerations set forth in Tennessee Code Annotated section 40-35-103. These considerations which militate against alternative sentencing include: the need to protect society by restraining a defendant having a long history of criminal conduct, whether confinement is particularly appropriate to effectively deter others likely to commit a similar offense, the need to avoid depreciating the seriousness of the offense, and the need to order confinement in cases in which less restrictive measures have often or recently been unsuccessfully applied to the defendant. Tenn. Code Ann. § 40-35-103(1).

In determining whether to grant probation, the judge must consider the nature and circumstances of the offense, the defendant's criminal record, his background and social history, his present condition, including his physical and

mental condition, the deterrent effect on other criminal activity, and the likelihood that probation is in the best interests of both the public and the defendant. Stiller v. State, 516 S.W.2d 617, 620 (Tenn. 1974). The burden is on the Defendant to show that the sentence he received is improper and that he is entitled to probation. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In challenging the denial of probation, the Defendant first contends that the trial court's reliance on deterrence as a factor in denying probation was improper. He argues that the trial court's finding that confinement was appropriate "to provide an effective deterrence to others likely to commit similar offenses" was not supported by evidence in the record. In support of his argument, the Defendant cites well-established principles that the finding of deterrence within a jurisdiction cannot be conclusory but rather must be supported by evidence in the record. See Ashby, 823 S.W.2d at 170); State v. Hartley, 818 S.W.2d 370, 375 (Tenn. Crim. App. 1991).

We agree with the Defendant that the finding of deterrence cannot be merely conclusory but must be supported by proof in the record. Ashby, 823 S.W.2d at 170. We believe, however, that the record before us does contain evidence supporting the trial court's finding that confinement was appropriate "to provide an effective deterrence to others likely to commit similar offenses." In particular, the trial transcript contains testimony indicating that the victim's sister, Brianna Paulen, was subject to abuse by another babysitter. At trial, the Defendant elicited testimony from Brianna Paulen's mother, Alanna Simmons, that the babysitter she employed prior to Christine Johnson and the Defendant threw Brianna to the floor on one occasion. Moreover, the Defendant also

offered the testimony of Dr. William Moore, who treated the victim for various ailments in August of 1994, who stated that Alanna Simmons had reported concerns over abuse by her babysitter to him.

This record is similar to the case of State v. Davis, 940 S.W.2d 558 (Tenn. 1997), in which our supreme court upheld a finding of deterrence. In Davis, the defendant and a codefendant were convicted of vandalism. Davis, 940 S.W.2d at 559. The proof revealed that the acts of vandalism took place in the context of a labor dispute wherein the owner of the vandalized property had crossed picket lines. Id. at 558-59. The defendant and the codefendant were members of the labor union which was on strike. Id. A witness observed the defendant, the codefendant and an unidentified person vandalizing the victim's property. Id. at 559. The trial court denied probation based in part on a finding that confinement was necessary to deter others from committing similar offenses. Our supreme court concluded that the record supported the finding of deterrence, noting that there was evidence that an individual participating in criminal acts of vandalism had escaped unpunished. Id. at 560.

Applying the reasoning of Davis to the case sub judice, we believe that the record supports the trial court's application of deterrence as a factor to be considered in denying probation. The record in the present case indicates that other acts of abuse were committed against the victim's sister and potentially against the victim himself. Of course, the significance of deterrence in probation decisions "varies widely with the class of offense and the facts of each case." State v. Michael, 629 S.W.2d 13, 14-15 (Tenn. 1982). While we do not believe that the record in the case at bar supports placing exceptional significance on

deterrence, we cannot conclude that it was error for the trial judge to consider deterrence as a factor in arriving at his decision to deny probation.

Even more significant than deterrence, in our view, was the trial court's finding that confinement was necessary to avoid depreciating the seriousness of the offense. See Tenn. Code Ann. § 40-35-103(1)(B). We believe that the record in this case fully supports the application of this factor. The Defendant argues that in order to deny probation based on this factor, the circumstances of the offense must be "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree." Hartley, 818 S.W.2d at 374 (citation omitted). From our review, the circumstances of the offense as revealed in this record are especially shocking and reprehensible. The Defendant, entrusted with the care of a fifteen-month-old child, hit and kicked the infant in the head and abdomen multiple times. These blows produced substantial bleeding in the victim's body, causing blood to pool on both sides of the victim's brain and in his abdomen. The blows to the abdomen ruptured the victim's right adrenal gland, which is well-protected deep within the human body according to Dr. Harlan. The pooled blood placed pressure on the victim's bodily organs, especially his brain, and effectively removed one third of the victim's blood volume from circulation. As a result, the victim's bodily organs were, over the course of one to five days, deprived of sufficient nutrients and oxygen to sustain their functions. The victim eventually went into cardiac arrest and died. Based on these circumstances, we conclude that the trial court properly found that confinement was necessary to avoid depreciating the seriousness of the offense.

-13-

From our review, we believe that the trial court's findings that confinement was necessary to avoid depreciating the seriousness of the offense and to provide effective deterrence to others likely to commit similar offenses were supported by the record. As such, we believe that the application of these factors sufficiently rebutted the Defendant's presumed eligibility for alternative sentencing. Accordingly, we conclude that the trial judge did not abuse his discretion in denying probation. The Defendant's first issue lacks merit.[2]

In his second issue, the Defendant argues that his six-year sentence is excessive. He contends that the trial court erroneously failed to apply relevant mitigating factors. When an accused challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the

---

[2] As part of his first issue, the Defendant also contends that the trial judge followed an erroneous procedure in arriving at the decision to deny probation. He points to language of the trial judge regarding the Defendant's best interest being served by probation and society's best interest being served by confinement. The Defendant argues that this language indicates that the trial court used an "ad hoc balancing test" rather than statutory principles to deny probation. We disagree. The trial judge's comments at the sentencing hearing, read in full, clearly demonstrate that he was denying probation based on the statutory factors set forth in Tennessee Code Annotated section 40-35-103(1)(B). The language referred to by the Defendant indicates only that the trial judge was considering the best interests of both the Defendant and the public in arriving at his sentencing decision, as he was required to do. See Stiller v. State, 516 S.W.2d 617, 620 (Tenn. 1974).

presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the defendant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; see State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

As we stated above, the appropriate sentencing range for the Defendant was three to six years. The record reveals that the trial court applied three enhancement factors: 1) that the victim was particularly vulnerable because of age; 2) that the Defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense; and, 3) that the Defendant abused a position of private trust. Tenn. Code Ann. § 40-35-114(4), (5), (15). The trial court also applied one mitigating factor, that the Defendant acted under strong provocation. Tenn. Code Ann. § 40-35-113(2). The trial court placed great weight on all of the enhancement factors. Accordingly, the trial court sentenced the Defendant to the maximum applicable term of imprisonment, six years.

The Defendant's challenge to the length of his sentence focuses upon the application of mitigating factors.[3] The Defendant submitted a detailed sentencing memorandum to the trial court prior to the sentencing hearing. In that sentencing memorandum, and again at the sentencing hearing, the Defendant urged the trial court to find numerous mitigating factors, both statutory and non-statutory. In particular, the Defendant suggested three statutory mitigating factors: 1) that substantial grounds exist tending to excuse or justify his criminal conduct, though failing to establish a defense; 2) that he was suffering from a mental or physical condition that significantly reduced his culpability for the offense; and, 3) that although guilty of the crime, he committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his criminal conduct. Tenn. Code Ann. § 40-35-113(3), (8), (11). The Defendant also suggested a number of non-statutory mitigating factors under the catchall provision of Tennessee Code Annotated section 40-35-113(13):

> (a) he never contemplated that his acts might lead to such a tragic incident;
> (b) he is extremely remorseful for the pain and suffering he has brought upon the victim's family and his own family;
> (c) his character, habits, mentality, propensities, and activities indicate that he is unlikely to commit another crime;
> (d) he is devoted to his family;
> (e) he cooperated with authorities to the best of his ability throughout the course of the investigation and legal proceedings;
> (f) his conduct between the offense date and sentencing date has been exemplary;
> (g) he lacked a criminal felony record prior to this offense;
> (h) he lacked a record of violent offenses prior to this offense;
> (I) he suffers from a known mental defect;
> (j) he lacked a father figure during his childhood;
> (k) he has repeatedly voluntarily sought mental health treatment;
> (l) he has a family history of physical and sexual abuse;

---

[3] The Defendant first contends that the record is unclear as to which mitigating factors the trial court applied. We believe the record is clear that the trial court applied only one mitigating factor, that the Defendant acted under strong provocation. Tenn. Code Ann. § 40-35-113(2). As we will discuss later, the trial court grouped several of the factors suggested by the Defendant under the heading of "acting under strong provocation."

(m) he lacks substantial judgment due to his youth;
(n) he is not a dangerous, wild, reckless or violent man and has attempted to improve himself;
(o) he has potential for rehabilitation.

As we stated above, the trial court found only one mitigating factor applicable, that the Defendant acted under strong provocation. Tenn. Code Ann. § 40-35-113(2). The Defendant contends that the trial court erred by failing to apply all of the mitigating factors suggested.

In order to address the Defendant's argument, we must first examine the trial court's findings with regard to mitigating factors. The trial judge specifically stated that he found only one mitigating factor applicable, namely that the Defendant acted under strong provocation. Tenn. Code Ann. § 40-35-113(2). In so finding, however, the trial court did mention other factors suggested by the Defendant. Those factors dealt with the Defendant's physical and mental condition. As a result, the trial judge stated that the one factor he found applicable was "really two or three combined." It appears the factors were combined because they all stemmed principally from the same proof offered by the Defendant, that his culpability was lessened due to the effect his childhood physical and sexual abuse had on his mental state. It further appears that the trial judge grouped the factors under the heading of "strong provocation" in recognition of the jury's finding of "provocation" as part of the verdict of guilt of voluntary manslaughter.

After carefully reviewing the record, we cannot conclude that the trial judge erred in his application of mitigating factors. The Defendant suggested three statutory mitigating factors, that substantial grounds exist tending to excuse or

justify his conduct, that he was suffering from a mental or physical condition that significantly reduced his culpability, and that he committed the offense under such unusual circumstances that it is unlikely a sustained intent to violate the law motivated his conduct. Tenn. Code Ann. § 40-35-113(3), (8), (11). Under the circumstances of this case, however, each of these three factors focuses mainly on a single notion, that the Defendant's culpability was lessened due to the effect his childhood physical and sexual abuse had on his mental state, as is best evidenced by the proof of his intermittent explosive disorder. We believe that this mitigating evidence is adequately provided for in the trial court's finding of "strong provocation."

With regard to the numerous non-statutory mitigating factors suggested by the Defendant, we conclude that they are either not supported by proof or are included in the "strong provocation" mitigating factor. For instance, the Defendant's suggestion that he is extremely remorseful is not supported by proof in the record. The Defendant did not testify at trial or at the sentencing hearing. The record contains no evidence pertaining to the Defendant's remorse. Also unsupported by the record is the Defendant's suggestion that his character, habits, mentality, propensities, and activities indicate that he is unlikely to commit another crime. In fact, the presentence report indicates that the Defendant, twenty years old at the time of the offense, has juvenile convictions of theft, burglary, arson and shoplifting. Furthermore, it appears that the Defendant still suffers from intermittent explosive disorder, which has been a factor in his prior criminal behavior.

The Defendant asserts that he is devoted to his family, but the record is lacking. The principal proof pertaining to a stable familial relationship comes from a videotaped therapy session conducted during March of 1991 in which the Defendant states that he has a good relationship with his mother, his sister, and his grandmother. Given the level of proof and the remote date of the session, we do not believe the trial court erred in denying this mitigating factor. The Defendant also asserts that his cooperation with authorities should qualify as a mitigating factor. The Defendant is referring to his voluntary submission to interviews with police officers after the death of the victim. The Defendant's argument ignores that he gave conflicting accounts of what produced the victim's injuries during his interviews with police. Although the victim now claims that his diabetes was in part responsible for any confusion during the interviews, he has not produced evidence of his condition at the time of the interviews.

As yet another mitigating factor, the Defendant contends that his conduct between the offense date and sentencing date has been exemplary. Unfortunately, the Defendant has offered no evidence to support this claim other than bare assertions in his sentencing memorandum submitted to and argument before the trial court. The Defendant also asserts that he lacks a felony record and a violent record prior to the present offense. The presentence report indicates that the Defendant has juvenile convictions for theft, burglary, shoplifting and arson, dating from the age of thirteen. We fail to see how this record of prior offenses qualifies as a mitigating factor.

The remaining non-statutory mitigating factors submitted by the Defendant revolve around the lingering effects of childhood abuse on his mental state. The

nature and severity of that abuse are well-documented in the record. These additional factors, however, essentially restate the reasoning relied upon by the trial court in applying the "strong provocation" statutory mitigating factor. As such, we believe they were taken into account by the trial court at sentencing.

From our review of the record, we believe that the trial court considered the relevant principles of sentencing as well as the pertinent facts and circumstances detailed at trial and at the sentencing hearing. Notwithstanding the Defendant's argument to the contrary, the record establishes that the trial court followed the proper statutory procedure in setting the sentence. Obviously the trial court placed great weight upon the enhancement factors, none of which are challenged by the Defendant on appeal. We agree with the trial court that the circumstances of this offense are reprehensible and far outweigh the mitigating factor pertaining to the Defendant's mental state. Accordingly, we conclude that the Defendant has failed to carry his burden of establishing that his sentence was improper, particularly in light of the presumption of correctness afforded the trial court's ruling. The second issue on appeal therefore lacks merit.

In his third issue, the Defendant argues that the trial court erred by imposing restitution with a sentence of confinement. The record reveals that the trial court imposed nine thousand six hundred dollars ($9600) in restitution. The trial court imposed restitution to compensate the victim's family members for counseling expenses already incurred or to be incurred in the future. The Defendant contends that the trial court lacked statutory authority to order him to pay restitution to Alanna Simmons given that he was sentenced to a term of confinement.

On appeal, the State concedes that the trial court did, in fact, lack statutory authority to impose restitution. Under the law in effect at the time of the Defendant's sentencing, restitution could be imposed only as a condition of a sentence of probation. State v. Davis, 940 S.W.2d 558, 561-62 (Tenn. 1997). Accordingly, we conclude, as the State concedes, that the trial court erred by imposing restitution. We therefore reverse the judgment of the trial court insofar as it relates to the order of restitution.

For the reasons set forth in the discussion above, we conclude that the Defendant's first and second issues on appeal lack merit. Accordingly, we affirm his six-year sentence of confinement. The Defendant's third issue on appeal does have merit, however, and we therefore reverse the order of restitution and remand this case to the trial court solely for entry of a judgment consistent with this opinion.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
JERRY L. SMITH, JUDGE

_____
THOMAS T. WOODALL, JUDGE